E. Evans Wohlforth, Jr.
Timothy J. Duva
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
(973) 596-4500

ewohlforth@gibbonslaw.com
tduva@gibbonslaw.com

*Attorneys For Plaintiff*
*Connecticut General Life Insurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ROSELAND AMBULATORY SURGERY CENTER LLC,<br><br>Defendant. | ***Document Filed Electronically***<br><br>Civil Action No. 12-5941 (DMC) (MF)<br><br>**FIRST AMENDED COMPLAINT** |

Connecticut General Life Insurance Company ("CGLIC"), by and through its counsel Gibbons P.C., by way of this First Amended Complaint against Defendant Roseland Ambulatory Surgery Center LLC ("RASC"), hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. CGLIC is a corporation formed and existing under the laws of the State of Connecticut with its principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut. Therefore, CGLIC is a citizen of the State of Connecticut for purposes of diversity

jurisdiction under 28 U.S.C. § 1332.

2. RASC is a New Jersey limited liability company with its principal place of business in Roseland, New Jersey. Therefore, RASC is a citizen of the State of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

3. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, because CGLIC has brought a claim under the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001, et seq., which falls within the exclusive jurisdiction of this Court.

4. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because CGLIC and RASC are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

5. Venue in the United States District Court for the District of New Jersey is proper pursuant to 28 U.S.C. § 1391(b), because RASC resides in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

**FACTS**

6. CGLIC administers employee health benefit plans in the State of New Jersey and elsewhere. Those plans are governed by ERISA.

7. Among the health benefit plans that CGLIC administers are employer-funded Open Access Plus Medical Benefits Plans ("OAP Plans"). The summary plan description for an example OAP Plan that became effective in June 2008 is attached hereto as **Exhibit A**.[1] While individual employers may elect to offer different levels of benefits (i.e., different deductibles,

[1] The name of the employer who funded the plan attached hereto as Exhibit A has been redacted.

difference co-insurance amounts, etc.) through their OAP Plans, the remainder of the material plan language, including provisions related to general coverage exclusions and CGLIC's right to seek recovery of overpayments, is uniform in all OAP Plans.

8. The terms of CGLIC's OAP Plans relevant to general coverage and exclusions, as well as CGLIC's right to recover overpayment of benefits, have remained functionally identical from March 11, 2008, to the present. Compare Ex. A at 35 with Sample OAP Plan Effective November 1, 2010, attached hereto as **Exhibit B**, at 35 ("Payment for the following is specifically excluded from this plan: . . . charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."); compare Ex. A at p. 42 with Ex. B at 42 ("When an overpayment has been made by [CGLIC], [CGLIC] will have the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment.").

9. The OAP Plans administered by CGLIC allow for participants to obtain services from out-of-network providers, which are providers that do not have a contract with CGLIC and are therefore able to charge a higher amount for their services than CGLIC's in-network providers. See, e.g., Ex. A at 7; Ex. B at 7.

**Out-of-Network Cost Sharing and Deceptive Cost-share Waiver by Out-of-Network Providers**

10. Typically, in employee medical benefit plans that establish a network of medical providers, the plans provide that participants who obtain treatment from out-of-network providers are subject to higher out-of-pocket costs than if they had received treatment from an in-network provider. For instance, when a participant obtains services from an out-of-network provider, that participant is obligated to pay a larger share of the total cost of treatment in the

form of a higher deductible and/or a coinsurance payment (hereinafter "Cost-share" and, collectively, "Cost-share Charges"). See Ex. A at 11; Ex. B at 12 (setting forth the schedule of benefits for the OAP Plan and comparing the in-network and out-of-network benefits available thereunder).

11. The CGLIC OAP Plans express the out-of-network coinsurance portion of the Cost-share Charges as a percentage of the medical provider's fee that the member is obligated to pay. See Ex. A at 11; Ex. B at 12 ("The term Coinsurance means the percentage of charges for Covered Expenses than an insured person is required to pay under the plan.").

12. The standard practice of requiring cost-sharing by plan beneficiaries when they obtain out-of-network medical services is a key element of the economics of medical benefit plans, a material factor in the underwriting of the benefits including with respect to the calculation of premium costs or employer contributions, and a critical feature of ERISA employee welfare plans used to control the cost of medical care.

13. Employee benefit plans utilize the marketing leverage of their large pool of beneficiaries when negotiating rates of payment with medical providers. The resulting bargains are manifested in the in-network agreements with those providers.

14. In-network providers agree to accept reduced, negotiated rates in part because of the very large number of plan members who have an incentive to seek treatment from those in-network providers due to the fact that those members would pay lower or, in some cases, zero out-of-pocket cost when treating with in-network providers.

15. Another purpose of imposing Cost-share Charges pursuant to the terms of employee benefit plans is to provide an incentive for plan beneficiaries to seek out medical

providers that charge competitive rates.

16. Because a beneficiary is obligated to pay a percentage of an out-of-network provider's fee, the beneficiary will have an incentive to compare medical costs, and find medical providers that charge fees commensurate with other providers in the community.

17. Some out-of-network providers "game" this system. These out-of-network providers charge higher fees than in-network providers, but they do not charge their patients the associated Cost-sharing Charges. As alleged *infra*, RASC engages in this practice, which is referred to hereinafter as "Cost-share Waiver."

18. Out-of-network medical providers that engage in Cost-share Waiver undermine benefit plans' attempts to control healthcare costs and are able to receive higher fees while diverting patients from their in-network colleagues, whose fees are fixed by their in-network agreements.

19. The practice of Cost-share Waiver by out-of-network medical providers also undermines the attempts of benefit plans to control healthcare costs, because these out-of-network medical providers can charge non-competitive rates without providing a incentive to the plan beneficiary to seek care from a different provider that charges fees commensurate with other providers in the community.

20. When out-of-network medical providers submit claims for reimbursement of medical fees, they represent, explicitly and implicitly, that those claims are covered claims and that the elements and conditions of coverage have been satisfied.

21. A plan beneficiary's payment of Cost-share Charges is a condition of coverage with respect to out-of-network medical costs, and, if this obligation is not enforced, then the plan

beneficiaries' claim is not payable under the terms of the plan.

22. In the alternative to the foregoing paragraph, the plans explicitly exclude from coverage any services for which the beneficiary is not required to pay.

23. Benefit plans express out-of-network coverage as a percentage of otherwise covered expenses. Thus, if the beneficiary is required to pay nothing for a particular service, the plan's coverage obligation is zero.

24. Out-of-network providers that engage in Cost-share Waiver know that benefit plans will not pay claims from out-of-network providers that enter into arrangements with their patients whereby the patients will owe no Cost-share Charges to the out-of-network providers.

25. Out-of-network providers that engage in Cost-share Waiver know that benefit plans will not pay claims from out-of-network providers that forgive, forbear to collect, fail to collect or waive Cost-share Charges from patients as a regular billing practice.

26. Claims submitted by medical providers constitute an explicit and/or implicit representation that the provider has a good faith belief that the claim is covered and that the conditions of coverage have been satisfied and/or that coverage is not excluded.

27. Claims submitted by out-of-network providers that engage in Cost-share Waiver are intentionally deceptive because those providers know that agreeing not to collect the Cost-share Charges and/or failing to bill or collect Cost-share Charges prevents a condition of coverage from being fulfilled, or, in the alternative, results in an exclusion of coverage, and that the claim is not, therefore, payable.

**<u>Roseland Ambulatory and Cost-share Waiver</u>**

28. RASC is an out-of-network provider that has rendered health benefits services to

participants enrolled in, inter alia, employer-funded OAP Plans administered by CGLIC

29. Upon information and belief, between approximately March 11, 2008 and January 21, 2012, RASC engaged in Cost-share Waiver as a regular practice.

30. On information and belief, RASC formed an understanding with a substantial number of its patients, or, in the alternative, with all of its patients, pursuant to which RASC undertook to accept the amounts paid by CGLIC and waive or otherwise decline to collect in whole or in part CGLIC participants' obligations to pay the Cost-share Charges as required under those plans.

31. Between approximately March 11, 2008 and August 24, 2011, RASC submitted over 990 claims to CGLIC as an assignee of its patients' rights under OAP Plans administered by CGLIC. A spreadsheet listing the patients, dates of service, amounts that CGLIC paid to RASC and other pertinent information associated with the claims that RASC submitted to CGLIC during that period is attached hereto as **Exhibit C** (the "Cost-share Waived Claims"). CGLIC has paid RASC approximately $5,156,079.17 on those claims. See Ex. C.

32. At the time that they received treatment from RASC, each of the patients listed in Exhibit C were covered under an employer-funded OAP Plan administered by CGLIC (the OAP Plans under which the patients listed in Exhibit C were covered at the time they received services from RASC are referred to collectively as the "Plans").

33. As to each of the Cost-share Waived Claims, RASC contacted CGLIC representatives prior to providing medical services to its patients and inquired what the basic terms of eligibility and relevant coverage were with respect to those patients.

34. As to each of the Cost-share Waived Claims, CGLIC representatives advised

RASC that the beneficiaries were subject to a deductible or co-insurance obligation.

35. The Plans afford CGLIC discretionary authority to, among other things, determine participants' eligibility for benefits. See Ex. A at p. 54; Ex. B at p. 56 ("The Plan Administrator delegates to [CGLIC] the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan.") As such, when administering the Plans in its capacity as the claims administrator, CGLIC qualifies as a "fiduciary" under ERISA.

36. An appreciable number of RASC's patients who are the subject of the Cost-share Waived Claims did not pay any Cost-share Charges and, on information and belief, none of RASC's patients who are the subject of the Cost-share Waived Claims paid any Cost-share Charges.

37. Upon information and belief, and unbeknownst to CGLIC at the time, RASC engaged in similar Cost-share Waiver practices with regard to nearly all of the claims that it submitted to CGLIC under the Plans between March 11, 2008 and August 24, 2011. Indeed, despite having had a full opportunity to disclose its practice of Cost-share Waiver on any individual claim form (such as in the "Non-Covered Charges" box or the "Remarks" section of the forms), or through some other means thereafter, RASC never did so. RASC therefore failed to disclose to CGLIC that its patients, on whose behalf RASC submitted claims to CGLIC, were not obligated to pay for RASC's services and/or that such Cost-share Charges would not be billed or collected.

38. Payment of the Cost-share Charges, including co-insurance and deductible obligations, were a condition of coverage under the OAP Plans at issue with regard to the Cost-share Waived Claims. RASC's failure to bill or collect the Cost-share Charges, whether by

agreement with its patients or otherwise, therefore resulted in the Cost-share Waived Claims being ineligible for coverage under the Plans.

39. The Plans contain several "exclusion" provisions that expressly disclaim coverage for certain types of claims. For instance, at the time that RASC rendered services to patients enrolled in the Plans, each of the Plans contained an exclusion expressly disclaiming coverage for any charges that: (1) the participant was not obligated to pay; (2) for which the participant was not billed; and/or (3) for which the participant would not have been billed except that they were covered under his/her health benefits plan (the "Patient Responsibility Exclusion"). See Ex. A at p. 35; Ex. B at p. 35.

40. Upon information and belief, because RASC's patients were not billed for and/or were not otherwise obligated to pay anything toward the claims that RASC submitted under the Plans between March 11, 2008 and August 24, 2011, those claims were therefore not eligible for coverage under the Plans pursuant to the Patient Responsibility Exclusion.

41. In light of RASC's pattern of Cost-share Waiver, most, if not all, of the claims that RASC submitted to CGLIC were ineligible for coverage under the Plans pursuant to the Patient Responsibility Exclusion, and any funds that CGLIC paid to RASC for such claims were paid in error and/or induced by RASC's Cost-share Waiver practice and deceptive and fraudulent billing practices.

## CAUSES OF ACTION

### COUNT ONE
### (29 U.S.C. § 1132(a)(3))

42. CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 41 of the First Amended Complaint as though fully set forth herein at length.

43. The terms of the Plans provide, among other things, that in the event CGLIC makes an overpayment to a beneficiary, CGLIC has the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment. See Ex. A at p. 42; Ex. B at p. 42.

44. As such, any funds paid out under the terms of the Plans are subject to an equitable lien by agreement.

45. CGLIC has paid RASC approximately $5,156,079.17 for claims submitted by RASC between March 11, 2008 and August 24, 2011. Most, if not all, of those payments were related to charges that the participants were not obligated to pay, were not billed, and/or would not have been billed except that they were covered under the Plans, and any such charges were ineligible for coverage under the Plans pursuant to the Patient Responsibility Exclusion.

46. Any such claims that CGLIC paid, but which were excluded from coverage under the Plans due to RASC's Cost-share Waiver, constitute overpayments that CGLIC has the right to recover pursuant to the Plans.

47. As a fiduciary of the Plans, CGLIC is entitled to equitable relief pursuant to 29 U.S.C. § 1132(a)(3) to enforce the terms of the Plans and recover the overpayments.

48. CGLIC is entitled to recover its costs and reasonable attorneys' fees in maintaining this action under the terms of ERISA and/or the Plans.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

**COUNT TWO**

***(Fraud)***

49. CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 48 of the First Amended Complaint as though fully set forth herein at length.

50. At the time that it submitted claims to CGLIC, RASC knew that its patients' payment of Cost-share Charges was a prerequisite to coverage under the Plans and also knew that it would never bill or otherwise attempt to collect Cost-share Charges from any patients with whom RASC had entered into a Cost-share Waiver arrangement.

51. At the time that it submitted claims to CGLIC, RASC knew that it had entered into understandings with its patients pursuant to which the patients would not be obligated to pay their Cost-share Charges under the relevant plans.

52. At the time that it submitted claims to CGLIC, RASC knew that it intended never to bill or collect any Cost-share Charges from the patients for which RASC made the Cost-share Waived Claims.

53. In all instances in which RASC submitted a claim to CGLIC on behalf of a patient with whom RASC engaged in Cost-share Waiver, the claims that RASC submitted to CGLIC contained a misrepresentation of fact material to CGLIC's determination of whether the claims were eligible for coverage.

54. RASC knew that, if CGLIC knew that RASC had engaged in Cost-share Waiver, CGLIC would not have paid the Cost-share Waived Claims.

55. As RASC made these material misrepresentations of fact to CGLIC in connection

with claims for benefits under the Plans, RASC intended for CGLIC to rely on those misrepresentations.

56. CGLIC reasonably relied on the information that RASC submitted in support of its claims for benefits and, in fact, depended on that information when determining whether RASC's claims were eligible for coverage under the Plans.

57. CGLIC has been damaged as a result of its reliance on RASC's material misstatements. For instance, if not for RASC's misrepresentations, CGLIC would have been aware that most, if not all, of the claims that RASC submitted to CGLIC were ineligible for coverage under the Plans. CGLIC would therefore have denied and not paid RASC's claims.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with punitive damages, pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

**COUNT THREE**

***(Unjust Enrichment)***

58. CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 57 of the First Amended Complaint as though fully set forth herein at length.

59. RASC's actions have resulted in an economic benefit being conferred upon RASC to which it is not entitled.

60. Specifically, RASC has received payment from CGLIC for claims that were not covered under the terms of the Plans.

61. To permit RASC to retain that economic benefit would result in an unjust enrichment at CGLIC's expense and detriment.

62. As a direct and proximate result of RASC's conduct, it has been unjustly enriched and CGLIC has suffered damages in an amount in excess of $75,000.00, subject to proof at trial.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

**GIBBONS P.C.**

*Attorneys for Plaintiff*
*Connecticut General Life Insurance Company*

s/ E. Evans Wohlforth, Jr.
E. Evans Wohlforth, Jr.
Timothy J. Duva

Dated: December 7, 2012