Evans Wohlforth, Jr., Esq.
Christopher Walsh, Esq.
Samuel I. Portnoy, Esq.
Caroline E. Oks, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey  07102-5310
(973) 596-4500
ewohlforth@gibbonslaw.com

*Attorneys For Plaintiff*
*Connecticut General Life Insurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>ROSELAND AMBULATORY SURGERY CENTER, LLC, ROSELAND AMBULATORY SURGERY CENTER LLC, RICHARD LIPSKY, ANASTASIA BURLYUK, JOHN DOES 1-50, and ABC ENTITIES 1-50,<br><br>    Defendants. | *Document Filed Electronically*<br><br>Civil Action No. 12-5941 (MCA) (LDW)<br><br><br>**[PROPOSED]**<br>**SECOND AMENDED COMPLAINT** |

Connecticut General Life Insurance Company ("CGLIC"), by and through its counsel Gibbons P.C., by way of this Second Amended Complaint against Defendants Roseland Ambulatory Surgery Center, LLC ("RASC"), Roseland Ambulatory Surgery Center LLC, Richard Lipsky, Anastasia Burlyuk, John Does 1-50, and ABC Entities 1-50, hereby alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      CGLIC is a corporation formed and existing under the laws of the State of Connecticut with its principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut.  Therefore, CGLIC is a citizen of the State of Connecticut for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

2.      RASC is a New Jersey limited liability company with its principal place of business in Roseland, New Jersey.  Therefore, RASC is a citizen of the State of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.  RASC was formed on May 25, 2005 with Business Identification Number 0600237901.

3.      Roseland Ambulatory Surgery Center LLC is a New Jersey limited liability company with its principal place of business in New Jersey.  Therefore, Roseland Ambulatory Surgery Center LLC is a citizen of the State of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.  Roseland Ambulatory Surgery Center LLC was formed on July 8, 2015 with Business Identification Number 0450002618. The Certificate of Formation for this entity lists Defendant Richard Lipsky as its authorized representative.

4.      Richard Lipsky ("Lipsky") is an individual who resides in New Jersey. Therefore, Lipsky is a citizen of the State of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.  Lipsky is a principal of RASC and of Roseland Ambulatory Surgery Center LLC.

5.      Anastasia Burlyuk ("Burlyuk") is an individual who resides in New Jersey. Therefore, Burlyuk is a citizen of the State of New Jersey for purposes of diversity jurisdiction under 28 U.S.C. § 1332.  Burlyuk is a principal of RASC.

6.      Defendants John Does 1-50 and ABC Entities 1-50 are fictitious names representing one or more persons, corporations or other entities for whose benefit Lipsky,

Burlyuk and/or Roseland Ambulatory Surgery Center LLC received the transfers at issue in this Second Amended Complaint and/or are the initial, immediate or mediate transferee(s) of the transfer(s) at issue in this Second Amended Complaint.

7.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, because CGLIC has brought a claim under the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001, et seq., which falls within the jurisdiction of this Court.

8.      This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because CGLIC and RASC, Roseland Ambulatory Surgery Center LLC, Lipsky, and Burlyuk are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.00.

9.      Venue in the United States District Court for the District of New Jersey is proper pursuant to 28 U.S.C. § 1391(b), because RASC, Roseland Ambulatory Surgery Center LLC, Lipsky, and Burlyuk reside in this District and because a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTS

10.      CGLIC administers employee health benefit plans in the State of New Jersey and elsewhere.  Those plans are governed by ERISA.

11.      Among the health benefit plans that CGLIC administers are employer-funded Open Access Plus Medical Benefits Plans ("OAP Plans").  The summary plan description for an example OAP Plan that became effective in June 2008 is attached hereto as **Exhibit A**.[1]  While individual employers may elect to offer different levels of benefits (i.e., different deductibles, different co-insurance amounts, etc.) through their OAP Plans, the remainder of the material plan language, including provisions related to the grant of coverage for benefits, the scope of

---

[1] The name of the employer who funded the plan attached hereto as Exhibit A has been redacted.

coverage, coverage exclusions and CGLIC's right to seek recovery of overpayments, is functionally identical in all OAP Plans.

12.     The Summary Plan Descriptions are plan documents which, in combination with other plan documents or by themselves, constitute authoritative statements of plan terms.

13.     The OAP Plans are plans of indemnity.  The Plans pay a portion of amounts that its beneficiaries owe to third parties for medical services those beneficiaries received.   The language that contains the basic grant of coverage states:  "The term Covered Expenses means the expenses incurred by or on behalf of a person for the charges listed below . . . . Expenses incurred for such charges are considered Covered Expenses to the extent that the services or supplies provided are recommended by a Physician, and are Medically necessary for the care and treatment of an Injury or a Sickness, as determined by [CGLIC]."  Ex. A at 21.

14.     The terms of CGLIC's OAP Plans relevant to general coverage and exclusions, as well as CGLIC's right to recover overpayment of benefits, have remained functionally identical from March 11, 2008, to the claim latest in time that is the subject of this action.  Compare Ex. A at 35 with Sample OAP Plan Effective November 1, 2010, attached hereto as **Exhibit B**, at 35 ("Payment for the following is specifically excluded from this plan:  . . . charges which you are not obligated to pay or for which you are not billed or for which you would not have been billed except that they were covered under this plan."); compare Ex. A at 42 with Ex. B at 42 ("When an overpayment has been made by [CGLIC], [CGLIC] will have the right at any time to:  (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment.").

15.     The OAP Plans administered by CGLIC provide benefits to cover portions of charges incurred for services rendered by out-of-network providers, which are providers that do

not have a contract with CGLIC and are therefore able to charge amounts for their services different than the amounts charged by CGLIC's in-network providers.  See, e.g., Ex. A at 7; Ex. B at 7.

### Out-of-Network Cost Sharing and Deceptive
### Cost-share Waiver by Out-of-Network Providers

16.     Typically, in employee medical benefit plans that establish a network of medical providers, the plans provide that participants who obtain treatment from out-of-network providers are subject to higher out-of-pocket costs than if they had received treatment from an in-network provider.  For instance, when a participant obtains services from an out-of-network provider, that participant is obligated to pay a larger share of the total cost of treatment in the form of a higher deductible and/or a coinsurance payment (hereinafter "Cost-share" and, collectively, "Cost-share Charges").  See Ex. A at 11; Ex. B at 12 (setting forth the schedule of benefits for the OAP Plan and comparing the in-network and out-of-network benefits available thereunder).

17.     The CGLIC OAP Plans express the out-of-network coinsurance portion of the Cost-share Charges as a percentage of the medical provider's fee that the member is obligated to pay.  See Ex. A at 11; Ex. B at 12 ("The term Coinsurance means the percentage of charges for Covered Expenses than an insured person is required to pay under the plan.").

18.     The standard practice of requiring cost-sharing by plan beneficiaries when they obtain out-of-network medical services is a key element of the economics of medical benefit plans, a material factor in the underwriting of the benefits including with respect to the calculation of premium costs or employer contributions, and a critical feature of ERISA employee welfare plans used to control the cost of medical care.

19.     Employee benefit plans utilize the marketing leverage of their large pool of beneficiaries when negotiating rates of payment with medical providers.  The resulting bargains are manifested in the in-network agreements with those providers.

20.     In-network providers agree to accept reduced, negotiated rates in part because of the very large number of plan members who have an incentive to seek treatment from those in-network providers due to the fact that those members would pay lower or, in some cases, zero out-of-pocket cost when treating with in-network providers.

21.     Another purpose of imposing Cost-share Charges pursuant to the terms of employee benefit plans is to provide an incentive for plan beneficiaries to seek out medical providers that charge competitive rates.

22.     Because a beneficiary is obligated to pay a percentage of an out-of-network provider's fee, even if the beneficiary chooses to forego the savings that results from selecting an in-network provider, the beneficiary will have an incentive to compare medical charges by different out-of-network providers and to choose providers that charge fees commensurate with other providers in the community and that reflect the actual value of the services rendered.

23.     Some out-of-network providers "game" this system.  These out-of-network providers charge higher fees than in-network providers, but they do not charge their patients the associated Cost-sharing Charges.  As alleged *infra*, RASC engages in this practice, which is referred to hereinafter as "Cost-share Waiver."

24.     Out-of-network medical providers that engage in Cost-share Waiver undermine benefit plans' attempts to control healthcare costs and are able to receive higher fees while diverting patients from their in-network colleagues, whose fees are fixed by their in-network agreements.

25.     The practice of Cost-share Waiver by out-of-network medical providers also undermines the attempts of benefit plans to control healthcare costs, because these out-of-network medical providers can charge grossly inflated rates, without providing an incentive to the plan beneficiary to seek care from a different provider that charges fees commensurate with other providers in the community.

26.     When out-of-network medical providers submit claims for reimbursement of medical fees, they represent, explicitly and implicitly, that those claims are true, accurate and complete, and that the claims are covered claims and that the elements and conditions of coverage have been satisfied.

27.     The definition of coverage under the benefit plans as indemnification for "costs incurred" is explicit in the plans and an actual obligation to pay a cost is a required element or condition of coverage under the plans.

28.     Benefit plans express out-of-network coverage as a percentage of costs incurred for covered expenses.  Thus, if the beneficiary is required to pay nothing for a particular service, the plan's coverage obligation is zero.

29.     A plan beneficiary's payment of Cost-share Charges is a required element or condition of coverage with respect to out-of-network medical costs, and, if this obligation is not enforced, then the plan beneficiary's claim is not payable under the terms of the plan.

30.     In addition to stating that an incurred cost is an element or condition of coverage, the concept is restated as an exclusion from coverage for any services for which the beneficiary is not required to pay.

31.     Out-of-network providers like RASC typically submit claims for reimbursement of medical fees with assignment of OAP Plan benefits by their patients.  Thus, the claims

submitted by out-of-network providers are subject to all terms and conditions of those OAP Plans.

32.    As a result of that assignment, out-of-network providers know that benefit plans will not pay claims from out-of-network providers that enter into arrangements with their patients whereby the patients will owe no Cost-share Charges to the out-of-network providers.

33.    As a result of that assignment, out-of-network providers know that benefit plans will not pay claims from out-of-network providers that forgive, forbear to collect, fail to collect or waive Cost-share Charges from patients.

34.    As a result of that assignment, out-of-network providers know that benefit plans will not pay for costs that their beneficiaries are not actually obligated to pay.

35.    Claims submitted by medical providers constitute an explicit and/or implicit representation that the claims are true, accurate and complete, and that the provider has a good faith belief that the claim is covered and that the conditions of coverage have been satisfied and/or that coverage is not excluded.

36.    Claims submitted by medical providers constitute an explicit and/or implicit representation that the claim is true, accurate and complete, and that the claim is for coverage for costs incurred by beneficiaries for medical services for and in amounts which the beneficiaries are obligated to pay and would pay if the benefit did not exist.

37.    Claims submitted by out-of-network providers that engage in Cost-share Waiver are intentionally deceptive because those providers know that agreeing not to collect the Cost-share Charges and/or failing to bill or collect Cost-share Charges prevents a condition of coverage from being fulfilled, or, in the alternative, results in an exclusion of coverage, and that the claim is not, therefore, payable.

**Cost-Share Waiver and False Billing**
**by Out-of-Network Providers**

38.     As outlined above, the practice of Cost-share Waiver facilitates and constitutes a species of the deceptive practice, "False Billing."  As noted, at several places in the plan documents the basic nature of the plan benefits is explicit--the plans indemnify beneficiaries for obligations to third party medical professionals for "costs incurred" for medical services received.

39.     As a result of this definition of coverage, the plans cover only those amounts beneficiaries are obligated to pay and do not cover those amounts that the beneficiaries are not obligated to pay.

40.     Using the technique of Cost-share Waiver and because, as noted, out-of-network providers have no pre-negotiated rates with payors, out-of-network medical providers can issue what is essentially a fictitious or nominal bill for an amount that bears no relation to the value of the service received and in excess of an amount that a provider would actually obligate a patient to pay for the service provided.

41.     In the absence of an enforced Cost-share Charge, the rates of out-of-network medical providers are not constrained by any economic or contractual considerations.  "Bills" based upon such rates and claims for benefits generated by them may not represent a charge that anyone is actually expected or obligated to pay.  Such a bill is referred to hereinafter as a "False Bill."

42.     When an out-of-network provider submits a False Bill to a payor in support of a claim, it does so with no intention of obligating its patient to pay the amount of the False Bill, and, as a result, there is no obligation that would trigger the benefit of indemnification under a typical health benefit plan.

43.    Out-of network providers who submit False Bills are not entitled to payment on their claims not only because they violate a condition of coverage by engaging in Cost-share Waiver, but separately, because there is no payment obligation covered under the OAP Plan; the beneficiary has not actually been billed for anything.

44.    As a result, to the extent a claim represents the amount of a False Bill for which the beneficiary is not obligated to pay, such a claim (i) does not fall within the grant of coverage for "costs incurred" and (ii) is excluded from coverage under the plans independently and without reference to the concept of Cost-share Obligation.  Thus, False Billing can occur where the Cost-share Obligation is waived and also when there is no Cost-share Obligation.

45.    With respect to an OAP Plan such as those administered by CGLIC, a False Bill represents a false statement of "expenses incurred by or on behalf of a person for the charges listed . . . ." (emphasis added).  As stated in the grant of coverage for "Covered Expenses", the amount of the False Bill is not a Covered Expense under the terms of the OAP Plans, and the False Bill is submitted to induce a claims administrator such as CGLIC to pay more than it would pay to indemnify a OAP Plan beneficiary for actual costs incurred.

46.    Under the terms of the OAP Plans, the benefit payable for a charge for a medical service is limited to the lesser of the provider's normal charge or the Maximum Reimbursable Charge ("MRC") as defined in the plan.  The MRC is either (i) that charge for the same service made by a percentile of all the providers in the region, or (ii) a percentage of the Medicare reimbursement rate in the region.  For example, the MRC might be set by the plan at the amount charged by providers who charge 80% of the amount charged by providers in that geographic area for the given procedure.  Billed charges are important because, for a variety of reasons,

billed charges play a significant role in the calculation of the MRC and the ultimate adjudication of a claim.

47.     Payors like CGLIC may pay amounts in excess of the MRC.  These amounts are negotiated by third-party vendors.  These third-party vendors negotiate a discount of the out-of-network billed charged on a per-claim basis, or they have previously negotiated arrangements that the providers will accept a certain percent of their billed charge.  Once that amount is negotiated between the provider and the third-party vendor, it is submitted to CGLIC for approval.  CGLIC relies upon the provider's explicit and implicit representations contained within the billed charge and the negotiated arrangement, including, but not limited to, the consideration that the provider will not balance bill the member for charges represented by the provider to be real or actual charges, in making the determination.

48.     In all cases, and regardless of the method of calculating the allowed amount of coverage, coverage terms set forth in the Plans expressly continue to apply and at no point are those terms waived or merged into an agreement between the Plan and the provider.   In particular, the trigger of coverage--an obligation to pay imposed on the plan beneficiary--remains fundamental to the grant of benefits under the Plans and is not affected by any re-pricing negotiation or agreement.

49.     In all cases, where a bill is submitted for an amount in excess of amounts for which the patient is actually obligated to pay, the amount of that inflated False Bill is relevant and material to the calculation of the amount, if any, that is covered by the Plan and it forms the basis for determining the reimbursement, if any, owed to the provider.

50.     The submission of False Bills constitutes a false statement that the plan beneficiary has incurred an obligation to pay such bills, when, in fact, no such obligation is intended.

51.     The practice of Cost-share Waiver facilitates the use of False Bills and constitutes evidence that no real obligation has been created.  Regardless of the occurrence of Cost-share Waiver, however, False Bills do not constitute "Covered Expenses" under the terms of the OAP plans and payments made on account of False Bills are improper, contrary to plan terms and induced by fraud.

**RASC's Cost-share Waiver and False Billing**

52.     RASC is an out-of-network provider that has allegedly rendered medical services to participants enrolled in, inter alia, employer-funded OAP Plans administered by CGLIC.

53.     Between approximately March 11, 2008 and August 24, 2011, claims submitted by RASC with respect to the Amended Exhibit C Claims did not represent a true charge intended to obligate any person.  They were False Bills as described above.

54.     Claims submitted by RASC with respect to the Amended Exhibit C Claims were inflated, in excess of any amount that RASC or any other provider would expect a health care consumer to pay, and bore no relation to the value of the services rendered to the beneficiaries.

55.     Between approximately March 11, 2008 and August 24, 2011, RASC engaged in Cost-share Waiver as a regular practice.

56.     On information and belief, RASC formed an understanding with a substantial number of its patients, or, in the alternative, with all of its patients, pursuant to which RASC undertook to accept the amounts paid by CGLIC and to waive or otherwise decline to collect in whole or in part CGLIC participants' obligations to pay the Cost-share Charges as required under those plans.

57.     Between approximately March 11, 2008 and August 24, 2011, RASC submitted over 990 claims to CGLIC as an alleged assignee of its patients' rights under OAP Plans administered by CGLIC.  Through pre- and post-litigation discovery, CGLIC has collated information relating to these claims, and narrowed the set of claims at issue.  A spreadsheet listing the patients, dates of service, amounts that CGLIC paid to RASC and other pertinent information associated with 829 claims that RASC submitted to CGLIC during that period is attached hereto as **Exhibit C** (the "Amended Exhibit C Claims").  CGLIC has paid RASC approximately $4,288,296.33 on those claims.  See Ex. C.

58.     At the time that they received treatment from RASC, each of the patients listed in Exhibit C were covered under an employer-funded OAP Plan [a small number of the plans were financed by a policy of insurance issued and administered by CGLIC] administered by CGLIC (the OAP Plans under which the patients listed in Exhibit C were covered at the time they received services from RASC are referred to collectively as the "Plans").

59.     Benefits payable under the Plans cover costs incurred by beneficiaries for charges by medical providers for certain, specified medical services received, i.e. Covered Costs and the existence of a legitimate obligation to pay on the part of the beneficiary was the trigger of coverage under the Plans.

60.     Payment of the Cost-share Charges, including co-insurance and deductible obligations, were a condition of coverage under the OAP Plans at issue with regard to the Cost-share Waived Claims.  RASC's failure to bill or collect the Cost-share Charges, whether by agreement with its patients or otherwise, resulted in the Amended Exhibit C Claims being ineligible for coverage under the Plans and demonstrates that the "bills" issued by RASC were False Bills that could not have supported a claim for coverage.

13

61. The Plans contain several "exclusion" provisions that expressly disclaim coverage for certain types of claims. For instance, at the time that RASC rendered services to patients enrolled in the Plans, each of the Plans contained an exclusion expressly disclaiming coverage for any charges that: (i) the participant was not obligated to pay; (ii) for which the participant was not billed; and/or (iii) for which the participant would not have been billed except that they were covered under his/her health benefits plan (the "Patient Responsibility Exclusion"). See Ex. A at p. 35; Ex. B at p. 35.

62. The Plans afford CGLIC discretionary authority to, among other things, determine participants' eligibility for benefits. See Ex. A at 54; Ex. B at 56 ("The Plan Administrator delegates to [CGLIC] the discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan.") Therefore, when administering the Plans in its capacity as the claims administrator, CGLIC qualifies as a "fiduciary" under ERISA.

63. The Amended Exhibit C Claims were based upon False Bills as previously defined in this pleading because the claims were for amounts that RASC's patients were not obligated to pay and RASC never intended that their patients would be obligated to pay the amounts reflected on the Amended Exhibit C Claims.

64. On information and belief, none of RASC's patients who are the subject of the Amended Exhibit C Claims received any bill for a charge for medical services provided by RASC and none of RASC's patients paid all or any portion of a charge to RASC [Plaintiff excerpts from these allegations a small handful of claims for which RASC has produced checks and other indicia of billing and/or collection. With respect to these (i) they represent a de

minimis number of claims in relation to the whole and (ii) CGLIC reserves all rights until the authenticity of the documents and the historic facts they purport to reflect are established].

65.     The Amended Exhibit C Claims do not represent costs incurred by plan beneficiaries for medical care and, therefore, they are not within the grant of coverage under the plans as "Covered Expenses."

66.     Following August 24, 2011 and through January 21, 2012, RASC continued to submit claims for medical benefits.  CGLIC refused to pay claims after August 24, 2011, because it had reasonable basis to believe that these were False Bills and that RASC would continue its practice of Cost-share Waiver.

67.     On information and belief, none of RASC's patients who are the subject of the Amended Exhibit C Claims paid any Cost-share Charges.

68.     Unknown to CGLIC at the time, RASC engaged in Cost-share Waiver practices with regard to all or nearly all of the claims that it submitted to CGLIC under the OAP Plans between March 11, 2008 and August 24, 2011.

69.     Despite having had a full opportunity to disclose its practice of Cost-share Waiver on any individual claim form (such as in the "Non-Covered Charges" box or the "Remarks" section of the forms), or through some other means thereafter, RASC never did so.  RASC therefore failed to disclose to CGLIC that its patients, on whose behalf RASC submitted claims to CGLIC, were not obligated to pay for RASC's services and/or that such Cost-share Charges would not be billed or collected.

70.     RASC's practice of submitting False Bills was facilitated by its practice of Cost-share Waiver, because RASC knew that its patients would not pay a co-insurance percentage or

other Cost-share amount in relation to the inflated amounts in the False Bills or any portion of any balance bill.

71.     All or nearly all of the claims submitted by RASC to CGLIC prior to August 21, 2011, were referred to CGLIC's vendor Viant for 're-pricing' as previously alleged.

72.     Subject to all OAP Plan terms and subsequent acceptance by CGLIC, Viant either negotiated the claims individually or under a pre-arranged multi-claim agreement between Viant and RASC pursuant to which the proposed, allowed claim would be discounted by a percentage of the original False Bill submitted by RASC.

73.     Because the original False Bills were in an amount that was inflated, in excess of bills typical for the procedure provided and bore no relation to the actual value of the services received, and because RASC never intended to balance bill any patient, the re-pricing negotiations with Viant started at an artificially high amount, there was no real consideration provided by RASC, and the discounted amounts achieved through the Viant re-pricing was inflated and in excess of what the discounted amount would have been had the False Bill reflected a true cost for services rendered.

74.     As a result of RASC's False Bills, CGLIC was induced to allow and pay amounts for the Amended Exhibit C Claims that the Plans should not have paid because the claims submitted were not true statements of costs incurred by RASC's members.

75.     As a result of RASC's False Bills, CGLIC was induced to allow and pay amounts for the Amended Exhibit C Claims in excess of amounts that it would have paid had RASC not submitted False Bills for payment.

76.     Payment of the Cost-share Charges, including co-insurance and deductible obligations, were a condition of coverage under the OAP Plans at issue with regard to the Cost-

share Waived Claims. RASC's failure to bill or collect the Cost-share Charges, whether by agreement with its patients or otherwise, therefore resulted in the Amended Exhibit C Claims being ineligible for coverage under the Plans.

77. Because RASC's patients were not billed for and/or were not otherwise obligated to pay anything toward the claims that RASC submitted under the Plans between March 11, 2008 and August 24, 2011, those claims were therefore not eligible for coverage under the Plans pursuant to the Patient Responsibility Exclusion.

78. In light of RASC's pattern of Cost-share Waiver, most, if not all, of the claims that RASC submitted to CGLIC were ineligible for coverage under the Plans, and funds that CGLIC paid to RASC for such claims were paid in error and/or induced by RASC's Cost-share Waiver practice and deceptive and fraudulent billing practices.

79. As to each claim submitted by RASC to CGLIC that constituted a False Bill, including without limitation any claim that involved Cost-share Waiver, such claims were wrongfully and improperly paid, payment was induced by fraud, and RASC was unjustly enriched thereby.

**Violations of the New Jersey Fraudulent Transfer Act**

80. On or about September 21, 2012, CGLIC filed the above-captioned action against RASC. CGLIC has alleged a right to recover in excess of $4 million from RASC.

81. RASC has averred that in the latter half of November 2012, "surgeons stopped booking cases at [RASC]" and that the "surgical volume" on which RASC's business depends "disappeared totally by the end of the first quarter of 2013."

82. In or around August of 2014, RASC sold the vast majority of its assets in exchange for approximately $3.3 million.

83.     Prior to and following the sale of RASC's assets, Burlyuk was a partial owner of RASC.  Specifically, she owned 50% of Complete Surgical Project Management, LLC which, in turn, owned 65% of Roseland Medical Realty, LLC, which was the 100% owner of RASC.

84.     RASC transferred approximately $1,100,000 of the proceeds of its asset sale to Burlyuk.

85.     On information and belief, any transfers Burlyuk made to RASC were in the form of equity contributions.

86.     On information and belief, RASC received nothing of value or less than reasonably equivalent value in exchange for its $1,100,000 transfer to Burlyuk.

87.     Prior to and following the sale of RASC's assets, Lipsky was a partial owner and manager of RASC.  Specifically, he owned 50% of Complete Surgical Project Management, LLC which, in turn, owned 65% of Roseland Medical Realty, LLC, which was the 100% owner of RASC.

88.     LER Realty, LLC owned the remaining 35% of Roseland Medical Realty, LLC. Lipsky's family members were joint owners of LER Realty, LLC.

89.     RASC transferred approximately $1,060,000 of the proceeds of its asset sale to Lipsky.

90.     On information and belief, any transfers Lipsky made to RASC were in the form of equity contributions.

91.     On information and belief, RASC received nothing of value or less than reasonably equivalent value in exchange for its $1,060,000 transfer to Lipsky.

92.     On information and belief, on or after September 21, 2012, RASC made other transfers of funds to Lipsky and/or Burlyuk without receiving anything of value or less than reasonably equivalent value in exchange.

93.     On or after September 21, 2012, RASC made additional transfers of funds to persons and entities, other than Burlyuk and Lipsky, including defendants John Does 1-50 and ABC Entities 1-50, without receiving anything of value or less than reasonably equivalent value in exchange.

94.     On information and belief, RASC did not receive anything of value, or less than reasonably equivalent value in exchange for those transfers.

95.     On information and belief, Lipsky and/or Burlyuk transferred some of the funds they received from RASC on or after September 21, 2012 to other persons or entities, including, without limitation, Roseland Ambulatory Surgery Center LLC, which was formed on July 8, 2015 by Lipsky as its authorized representative.

96.     On information and belief, Lipsky and Burlyuk did not receive anything of value, or less than reasonably equivalent value, in exchange for those transfers.

**Mid-Litigation Dissolution of Roseland and its Parent LLCs**

97.     Lipsky filed a Certificate of Dissolution and Termination for RASC, effective December 17, 2014, stating that "[t]he Entity has wound up all affairs and is hereby terminated."

98.     On December 17, 2014, Lipsky and Burlyuk filed a Certificate of Dissolution for Roseland Medical Realty, LLC, the 100% owner of RASC and a Certificate of Dissolution for Complete Surgical Project Management, LLC, which owned 65% of Roseland Medical Realty.

99.     On December 17, 2014, one of Lipsky's family members filed a Certificate of Dissolution of LER Realty, LLC.

100.    On information and belief, assets of RASC were transferred to Roseland Medical Realty, LLC, then to Complete Surgical Project Management, LLC and LER Realty, LLC and then to the individual owners of these entities--Lipsky and Burlyuk and Lipsky's family members for Lipsky's benefit.  This paragraph is pled in the alternative to the allegations above that the assets of RASC were transferred directly to Lipsky and Burlyuk

101.    On information and belief, the dissolution of RASC and its affiliates and the transfer of its assets, including those assets traceable and identifiable as paid to RASC due to the improper billing practices alleged herein, were undertaken with the intent to deprive CGLIC of its remedy in this action.

## CAUSES OF ACTION
## COUNT ONE
### (29 U.S.C. § 1132(a)(3))

102.    CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 101 of the Second Amended Complaint as though fully set forth herein at length.

103.    The terms of the OAP Plans provide, among other things, that in the event CGLIC makes an overpayment to a beneficiary, CGLIC has the right at any time to: (a) recover that overpayment from the person to whom or on whose behalf it was made; or (b) offset the amount of that overpayment from a future claim payment.  See Ex. A at 42; Ex. B at 42.

104.    As such, any funds paid out under the terms of the OAP Plans are subject to an equitable lien by agreement.

105.    CGLIC has paid RASC approximately $4,288,296.33 for claims submitted by RASC between March 11, 2008 and August 24, 2011.

106.    The payments alleged in the preceding paragraph were related to charges that the participants were not obligated to pay, were not billed, and/or would not have been billed except

that they were covered under the OAP Plans.  Therefore, the payments were not within the grant of coverage under the OAP Plans and were otherwise ineligible for coverage under the OAP Plans pursuant to the Patient Responsibility Exclusion.

107.    All such claims as alleged herein that CGLIC paid, but which were not covered under the OAP Plans or were excluded from coverage under the OAP Plans, constitute overpayments that CGLIC has the right to recover pursuant to the OAP Plans.

108.    As a fiduciary of the Plans, CGLIC is entitled to equitable relief pursuant to 29 U.S.C. § 1132(a)(3) to enforce the terms of the OAP Plans and recover the overpayments.

109.    The payments improperly made to RASC as a result of the billing practices alleged in this Second Amended Complaint and/or assets properly attributable to those payments are identifiable and presently in the hands of RASC or, in the alternative, certain transferees of RASC as further alleged in this Second Amended Complaint.

110.    To the extent payments improperly made to RASC as a result of the billing practices alleged in this Second Amended Complaint and/or assets properly attributable to those payments were transferred to third-parties those transfers may be avoided as fraudulent transfers and the identified funds returned to RASC for return to CGLIC as an equitable remedy.

111.    CGLIC is entitled to recover its costs and reasonable attorneys' fees in maintaining this action under the terms of ERISA and/or the OAP Plans.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

## COUNT TWO
### *(Fraud)*

112.    CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 111 of the Second Amended Complaint as though fully set forth herein at length.

113.    At the time that it submitted claims to CGLIC, RASC knew that its patients were not obligated to pay the amount of the claims, knew that the payment of Cost-share Charges was a prerequisite to coverage under the Plans and also knew that it would never bill or otherwise attempt to collect any amount, including without limitation Cost-share Charges from any patients for whom RASC submitted claims.

114.    At the time that it submitted claims to CGLIC, RASC knew that it had entered into understandings with its patients pursuant to which the patients would not be obligated to pay any amount, including without limitation any Cost-share Charges under the relevant plans.

115.    In all instances in which RASC submitted a claim to CGLIC on behalf of a patient RASC never intended to charge or with whom RASC engaged in Cost-share Waiver, the claims that RASC submitted to CGLIC contained a misrepresentation of fact material to CGLIC's determination of whether the claims were eligible for coverage.

116.    RASC knew that, if CGLIC knew that RASC had not obligated its patients to pay the amounts of the claims and/or that RASC had engaged in Cost-share Waiver, CGLIC would not have paid the Cost-share Waived Claims.

117.    As RASC made these material misrepresentations of fact to CGLIC in connection with claims for benefits under the Plans, RASC intended for CGLIC to rely on those misrepresentations.

118.    CGLIC reasonably relied on the information that RASC submitted in support of its claims for benefits and, in fact, depended on that information when determining whether

RASC's claims were eligible for coverage under the Plans and in making payments to RASC on those claims.

119.    CGLIC has been damaged as a result of its reliance on RASC's material misstatements.  For instance, if not for RASC's misrepresentations, CGLIC would have been aware that most, if not all, of the claims that RASC submitted to CGLIC were ineligible for coverage under the Plans.  CGLIC would therefore have denied and not paid RASC's claims.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with punitive damages, pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

### COUNT THREE
### *(Unjust Enrichment)*

120.    CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 119 of the Second Amended Complaint as though fully set forth herein at length.

121.    RASC's actions have resulted in an economic benefit being conferred upon RASC to which it is not entitled.

122.    Specifically, RASC has received payment from CGLIC for claims that were not covered under the terms of the Plans.

123.    To permit RASC to retain that economic benefit would result in an unjust enrichment at CGLIC's expense and detriment.

124.    As a direct and proximate result of RASC's conduct, it has been unjustly enriched and CGLIC has suffered damages in an amount in excess of $75,000.00, subject to proof at trial.

**WHEREFORE,** CGLIC demands judgment against RASC for damages in an amount greater than $75,000.00, together with pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

## COUNT FOUR
### *(New Jersey Fraudulent Transfer Act, N.J.S.A. 25:2-20, et. seq., )*

125.    CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 124 of the Second Amended Complaint as though fully set forth herein at length.

126.    At all relevant times, RASC was a "debtor" as that term is defined in N.J.S.A. 25:2-21.

127.    At all relevant times, CGLIC was a "creditor" with a "claim", as those terms are defined in N.J.S.A. 25:2-21.

128.    At all relevant times, Lipsky and Burlyuk were "insiders" of RASC as that term is defined in N.J.S.A. 25:2-22.

129.    Less than four years prior to the filing of this Second Amended Complaint, and after this action was commenced, RASC made "transfers" as that term is defined in N.J.S.A. 25:2-22, to or for the benefit of RASC insiders Lipsky and Burlyuk, and to or for the benefit of other persons or entities including, without limitation, Defendant Roseland Ambulatory Surgery Center LLC either: (a) with actual intent to hinder, delay or defraud CGLIC; or (b) without receiving reasonably equivalent value in exchange for the transfers.

130.    Prior to, or as a result of, those transfers, RASC was insolvent, became insolvent, had unreasonably small assets in relation to its business or its transactions, and/or intended to incur or reasonably believed that it would incur debts beyond its ability to pay as they became due.

131.    Each of these transfers were fraudulent within the meaning of N.J.S.A. 25:2-25(a), N.J.S.A. 25:2-25(b), N.J.S.A. 25:2-27(a), and/or N.J.S.A. 25:2-25(b).

132.    CGLIC is entitled to avoid those transfers pursuant to N.J.S.A. 25:2-29(a).

133.    CGLIC is entitled to recover the total amount of the transfers from RASC, Burlyuk, Lipsky, and/or Roseland Ambulatory Surgery Center LLC pursuant to N.J.S.A. 25:2-30(b).

**WHEREFORE,** CGLIC demands judgment against Defendants (i) avoiding the transfers by RASC to Lipsky and Burlyuk as fraudulent pursuant to N.J.S.A. 25:2-25(a), N.J.S.A. 25:2-25(b), N.J.S.A. 25:2-27(a), and/or N.J.S.A. 25:2-25(b); directing RASC, Lipsky, Burlyuk, and Roseland Ambulatory Surgery Center LLC to pay CGLIC the full amount of the transfers pursuant to N.J.S.A. 25:2-30(b); and (iii) awarding pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

## COUNT FIVE
### *(New Jersey Revised Uniform Limited Liability Company Act (hereinafter, the "Act") )*

134.    CGLIC repeats and realleges the allegations contained in Paragraphs 1 through 133 of the Second Amended Complaint as though fully set forth herein at length.

135.    RASC was 100% owned by Roseland Medical Realty, LLC, which was RASC's only member.

136.    Roseland Medical Realty, LLC, was 65% owned by Complete Surgical Project Management, LLC, and 35% owned by LER Realty, LLC, which were Roseland Medical Realty, LLC's only members.

137.    Complete Surgical Project Management, LLC was 50% owned by Lipsky and 50% owned by Burlyuk, who were Complete Surgical Project Management, LLC's only members.

138.    LER Realty, LLC was owned jointly by three of Lipsky's family members, who were LER Realty, LLC's only members.

139. On information and belief, LER Realty, LLC was the alter ego of Lipsky, and Lipsky acted at all times as the sole owner and member of LER Realty, LLC, causing its actual members to take whatever actions Lipsky directed.

140. Each of RASC, Roseland Medical Realty, LLC, Complete Surgical Project Management, LLC, and LER Realty, LLC were dissolved by the filing of Certificates of Dissolution on the same day, December 17, 2014.

141. Lipsky and Burlyuk, and Lipsky's family members for the benefit of Lipsky received assets from those entities to which they were members, which assets those entities received as members of entities which were members of RASC.

142. Prior to December 17, 2014, and continuing to the present time, CGLIC had and has a claim against RASC within the meaning of N.J.S.A. 42:2C-51.

143. By operation of N.J.S.A. 42:2C-51(d):

> A claim not barred under this section may be enforced:
> (1) against a dissolved limited liability company, to the extent of its undistributed assets; and
> (2) if assets of the company have been distributed after dissolution, against a member or transferee to the extent of that person's proportionate share of the claim or of the assets distributed to the member or transferee after dissolution, whichever is less, but a person's total liability for all claims under this paragraph does not exceed the total amount of assets distributed to the person after dissolution.

144. The assets of RASC were distributed to Lipsky and Burlyuk after the dissolution of RASC and Lipsky and Burlyuk are transferees within the meaning of N.J.S.A. 42:2C-51(d)(2).

145. Lipsky's and Burlyuk's proportionate share of CGLIC's claim against RASC totals 100%.

146. The assets of RASC were distributed to each entity in its chain of ownership and ultimately to those entities' individual members and CGLIC's claim against RASC is thus

enforceable against each of those members and, in the case of LER Realty, LLC, against Lipsky, pursuant to N.J.S.A. 42:2C-51(d).   The allegations of this paragraph are in the alternative to the allegations elsewhere in this Complaint that the assets of RASC were distributed directly to Lipsky and Burlyuk.

147.    CGLIC's claims can be enforced against Lipsky and Burlyuk pursuant to N.J.S.A. 42:2C-51(d), to the extent they received assets from RASC or to the extent of their proportional share of the claim, whichever is less.

**WHEREFORE,** CGLIC demands judgment against Defendants pursuant to N.J.S.A. N.J.S.A. 42:2C-51(d); directing RASC, Lipsky, Burlyuk, and Roseland Ambulatory Surgery Center LLC to pay CGLIC the full amount of those assets they received from RASC, Roseland Medical Realty, LLC, Complete Surgical Project Management, LLC, and LER Realty, LLC, or their proportionate share of CGLIC's claims together with pre-judgment and post-judgment interest, attorneys' fees, costs of suit, and all other such relief as the Court deems just and proper.

**GIBBONS P.C.**

*Attorneys for Plaintiff*
*Connecticut General Life Insurance Company*

DRAFT_____
E. Evans Wohlforth, Jr.

Dated:  February __, 2016